**Antonio BARRIENTES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69496.**

Court of Criminal Appeals of Texas, En Banc.

July 1, 1987.

Certiorari Denied June 30, 1988. See 108 S.Ct. 2915.

Jerrold R. Davidson, Brownsville, for appellant.

Benjamin Euresti, Jr., Dist. Atty., and Antonio Balderas, Jr., Asst. Dist. Atty., Brownsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

Appellant was jointly tried with code-fendant David Gonzales for capital murder. Appellant was convicted and punishment was assessed at death.

Evidence offered at the guilt-innocence portion of the trial showed that Jose Arredondo, the manager of a convenience store in Brownsville, was killed during a robbery on the afternoon of April 20, 1984. Arredondo's body was found in the cooler of the convenience store with four gunshot wounds to the head. Because appellant raises a question as to the sufficiency of the evidence to support the jury's affirmative answer to the second special issue—the issue of future dangerousness, we now summarize the evidence adduced at trial.

Sometime between 3:00 and 4:00 on the afternoon of April 20, 1984, appellant and his codefendant, David Gonzales, entered the Jamco convenience store with the intent of committing a robbery. While they were in the store, Felix Sanchez, a long time friend of appellant came into the store to pay for some gasoline. Sanchez testified that when he entered the store, there was no clerk standing behind the counter. Sanchez walked up to the counter and banged his hand on the counter to attract attention. Suddenly appellant popped up

from behind the counter. Sanchez asked appellant when he had started working at the store. Appellant replied, "Be quiet. I'm in the middle of a robbery." Sanchez testified that he was so frightened he just said, "I don't want nothing to do with it" and began walking toward the door of the store. As he neared the door, he heard appellant say in Spanish something to the effect that "he had to shoot the son of a bitch." Thinking that the threat was aimed at him, he hurried out the door. However, as he went out the door, his attention was drawn to the door going into the stockroom of the store. He saw appellant, holding a gun, pushing a person into the stockroom. Suddenly he heard two gunshots. Sanchez saw appellant turn around with the gun in his hand. Appellant then stuck the gun in the waistband of his pants. Sanchez got in his car and immediately left the scene.

After leaving the scene, Sanchez drove toward the expressway but stopped to get gasoline at the Economy Drive which was located within 400 feet of the Jamco convenience store. Sanchez testified that from this vantage point he observed appellant leave the store carrying a cardboard box and toward the rear of the building and out of sight.

Sanchez then drove toward his mother's house and while enroute encountered appellant and Gonzales in a gray Cadillac. He testified that both appellant and Gonzales made eye contact with him. After arriving at his mother's house, and while preparing to leave on a trip to Galveston, Sanchez observed the same gray Cadillac parked in the alley behind his mother's house. The appellant and Gonzales were seen behind a tool shed on the neighbor's property where "they were just looking at [Sanchez]." Thereafter, Sanchez's neighbor told the two men to get away.

Two other witnesses testified that they came into the store and appellant waited on them. Abelardo Vallejo testified that when he entered the store, appellant, who was standing behind the counter greeted him and asked him if he wanted a six-pack of beer. When Vallejo replied that he just wanted a package of Fritos and some sardines, appellant went to the shelf and got the items for him. Vallejo testified that appellant seemed nervous and had trouble opening the cash register. Ernesto Olivares, Jr., who worked next door, testified that as was his usual custom, he went to the store before going home for the afternoon. When he entered the store, the victim was not there but appellant was standing behind the counter. When Olivares asked where the victim was, appellant replied that he had gone to lunch. Olivares testified that when appellant had trouble opening the cash register, he asked what was wrong and appellant replied that the victim had not shown him how to operate the cash register properly. Olivares testified that he showed appellant how to operate the cash register and the gas pumps. Finally Olivares testified that, because he felt something was wrong, he waited in the store for approximately ten minutes hoping that the victim would return, but after a while he left the store.

The last witness called by the State was David Meza. Meza testified that while he was jailed on a DWI charge, he met appellant in the Cameron County jail. Appellant told him that he and Gonzales had been using drugs on the day of the offense and needed money to purchase more drugs. They went into the store, shot the victim and committed the robbery. Appellant also told Meza that he stayed in the store after the shooting and waited on several customers but left when one of the customers recognized him. Appellant also told Meza that he remembered only shooting the victim two times.

At the punishment stage of the trial, the State reoffered all the evidence adduced during the guilt-innocence portion of the trial. In addition, five witnesses testified that appellant's reputation for being a peaceful and law-abiding citizen was bad. One of the witnesses, Cameron County D.A. investigator Joe Garza, testified that in 1979, appellant was arrested on another capital murder charge but the case was still pending because the witness in the case had disappeared. Finally evidence was presented that during the course of

the instant trial, appellant had threatened to "get" or "take care" of State's witness Felix Sanchez.

■ We find that the State clearly proved that appellant would constitute a continuing threat to society. The evidence showed a cold-blooded and calculated murder, after which appellant remained in the store waiting on customers. Although appellant did not have any prior final felony convictions at the time of the trial, evidence was presented to show that appellant's reputation for being a peaceful and law-abiding citizen was bad and also that he had been previously arrested for another capital murder that had never been tried because the key witness had disappeared. Appellant followed the witness Sanchez to his home but was "chased" away by a neighbor. Finally, evidence was adduced showing that during the course of the trial in this case, appellant had openly made threats towards the State's eyewitness. Viewing the evidence in the light most favorable to the jury's finding on the second special issue, we find the evidence sufficient. Appellant's fourth point of error is overruled.

In his first point of error, appellant complains that the trial court erred in denying his motion for severance. Article 36.09, V.A.C.C.P., provides that a judge has discretion in deciding on whether to grant a motion for severance except:

"that in cases in which, upon timely motion to sever, and evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants."

The record shows that at the time the motion was presented to the judge, the judge ruled that the motion would be denied unless there was a statutory reason for granting it. Defense counsel responded that he knew of no such reason. At the punishment phase of the trial, the State introduced evidence that appellant's code-fendant, David Gonzales, had three prior convictions. Appellant made no objection to the admission of this evidence. Appellant maintains that the State's actions in not volunteering this information at the time of the hearing on the motion to sever denied him a fair and impartial trial.

■ Before a motion for severance is granted as a matter of right the accused must show that a codefendant has an admissible prior conviction while he, the accused (movant) does not. *Holbert v. State*, 457 S.W.2d 286 (Tex.Cr.App.1970). In *Jackson v. State*, 504 S.W.2d 488 (Tex.Cr. App.1974), we considered a similar allegation as is being made in the instant case. At the time Jackson's motion to sever was considered, Jackson did not offer any evidence nor did the State reveal that Jackson's codefendant had a prior conviction. However, during the punishment phase of the trial, the State did introduce evidence showing that the codefendant did have a prior conviction. This Court found that the State's failure to disclose the prior conviction was not a violation of due process in that the record of conviction was a public record equally accessible to Jackson and the State. The Court further found no error since Jackson had not met his burden of producing evidence to show that he himself did not have a prior conviction.

■ We find *Jackson* applicable to the instant case. Gonzales' prior convictions were a matter of public record, available to appellant and his counsel. Furthermore, the lack of error was clearly shown when evidence was introduced at the punishment phase of the trial which showed that appellant's trial counsel, while working as an assistant district attorney, had prosecuted Gonzales on one of the prior convictions. Finally, appellant failed to introduce evidence that he did not have any prior convictions. *Jackson v. State*, supra. We find no error.

In his second point of error, appellant argues that the trial court erred in denying appellant's motion to exclude the death penalty because the Texas death penalty statutes allow the arbitrary and capricious

infliction of the death penalty and thereby violate the Eighth Amendment to the United States Constitution. The Texas death penalty scheme was previously reviewed and declared constitutional in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). See also: *Phillips v. State,* 701 S.W.2d 875 (Tex.Cr.App.1985); *Fierro v. State,* 706 S.W.2d 310 (Tex.Cr.App.1986). This point of error is overruled.

In his third point of error, appellant argues that the trial court erred in not granting his motion to prevent the State from challenging for cause prospective jurors who voiced conscientious scruples against the infliction of the death penalty. Appellant argues that his motion should have been granted for two reasons: first, death-qualified jurors are less than neutral on the issue of guilt, and second, eliminating jurors with such feelings about the death penalty infringes on appellant's right to a jury which reflects a fair cross-section of the community.

■ The United States Supreme Court recently addressed these issues in the case of *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). McCree argued that the "death qualification" of the jury by the removal for cause of the "*Witherspoon*-excludables" violated his rights under the Sixth and Fourteenth Amendments to have his guilt or innocence determined by an impartial jury selected from a representative cross-section of the community. In its opinion, the Court declined to extend the fair cross-section requirement to impaneled petit juries. The Court further held that even if the fair cross-section requirement were extended to petit juries, people excluded from jury service because of their views as to the death penalty (*Witherspoon*-excludables) would not constitute "a 'distinctive' group in the community." As to McCree's contention about "death-qualified" jurors being prone to convict, the Court found no credible evidence showing that "death qualification" produces juries somewhat more "conviction-prone" than "non-death-qualified" juries. The Court went on to hold that even if

credible evidence was presented on that point, McCree was not entitled to relief:

> "McCree's 'impartiality' argument apparently is based on the theory that, because all individual jurors are to some extent predisposed towards one result or another, a constitutionally impartial *jury* can be constructed only by 'balancing' the various predispositions of the individual *jurors.* Thus, according to McCree, when the State 'tips the scales' by excluding prospective jurors with a particular viewpoint, an impermissibly partial jury results. We have consistently rejected this view of jury impartiality, including as recently as last Term when we squarely held that an impartial *jury* consists of nothing more than '*jurors* who will conscientiously apply the law and find the facts.' *Wainwright v. Witt,* 469 U.S. [412, 423] [105 S.Ct. 844, 852, 83 L.Ed.2d 841] (1985) (emphasis added); see also *Smith v. Phillips,* 455 U.S. 209, 217 [102 S.Ct. 940, 946, 71 L.Ed.2d 78] (1982) ('Due process means a jury capable and willing to decide the case solely on the evidence before it'); *Irvin v. Dowd, supra* [366 U.S. 717] at 722 [81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)] ('In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors')." *Lockhart v. McCree,* 476 U.S. at 177–79, 106 S.Ct. at 1767.

Any inquiry as to impartiality should focus on the jurors individually. Appellant has not singled out any particular juror who he alleges was impartial in his determination of guilt or innocence. We find the court properly overruled appellant's motion. The third point of error is overruled.

The judgment is affirmed.

CLINTON, J., dissents.

TEAGUE, J., expressly dissents to disposition of point of error number four.