# LOCKHART, DIRECTOR, ARKANSAS DEPARTMENT OF CORRECTIONS *v.* McCREE

No. 84–1865.   Argued January 13, 1986—Decided May 5, 1986

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. BLACKMUN, J., concurred in the result. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 184.

*John Steven Clark*, Attorney General of Arkansas, argued the cause for petitioner. With him on the briefs were *Jack*

*Gillean,* Assistant Attorney General, *Victra L. Fewell,* and *Leslie M. Powell.*

*Samuel R. Gross* argued the cause for respondent. With him on the brief were *John Charles Boger, James S. Liebman, William R. Wilson, Jr.,* and *Anthony G. Amsterdam.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Susan Crump, David Crump, Charles K. Graddick,* Attorney General of Alabama, *John J. Kelly,* Chief State's Attorney of Connecticut, *Jim Smith,* Attorney General of Florida, *Michael J. Bowers,* Attorney General of Georgia, *James Thomas Jones,* Attorney General of Idaho, *Neil F. Hartigan,* Attorney General of Illinois, *Linley E. Pearson,* Attorney General of Indiana, *Edwin Lloyd Pittman,* Attorney General of Mississippi, *William L. Webster,* Attorney General of Missouri, *Irwin I. Kimmelman,* Attorney General of New Jersey, *Paul Bardacke,* Attorney General of New Mexico, *David B. Frohnmayer,* Attorney General of Oregon, *Mark V. Meierhenry,* Attorney General of South Dakota, *Jim Mattox,* Attorney General of Texas, *Kenneth O. Eikenberry,* Attorney General of Washington, and *Stephen E. Merrill,* Attorney General of New Hampshire; and for the State of Arizona et al. by *Michael C. Turpen,* Attorney General of Oklahoma, and *David W. Lee, Hugh A. Manning, Tomilou Gentry Liddell, Robert A. Nance,* and *Jean M. LeBlanc,* Assistant Attorneys General, *Robert K. Corbin,* Attorney General of Arizona, *John Van de Kamp,* Attorney General of California, *Charles M. Oberly,* Attorney General of Delaware, *David L. Armstrong,* Attorney General of Kentucky, *William J. Guste, Jr.,* Attorney General of Louisiana, *Stephen H. Sachs,* Attorney General of Maryland, *Robert M. Spire,* Attorney General of Nebraska, *Brian McKay,* Attorney General of Nevada, *Stephen E. Merrill,* Attorney General of New Hampshire, *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Travis Medlock,* Attorney General of South Carolina, *W. J. Michael Cody,* Attorney General of Tennessee, *David L. Wilkinson,* Attorney General of Utah, *William G. Broaddus,* Attorney General of Virginia, and *Archie G. McClintock,* Attorney General of Wyoming.

Briefs of *amici curiae* urging affirmance were filed for the National Center on Institutions and Alternatives by *Allan Blumstein* and *Eric M. Freedman;* for Robert Popper et al. by *Robert Popper, pro se;* and for Billy Junior Woodward by *Reed E. Hundt* and *Thomas M. Carpenter.*

*Donald N. Bersoff* filed a brief for the American Psychological Association as *amicus curiae.*

JUSTICE REHNQUIST delivered the opinion of the Court.

In this case we address the question left open by our decision nearly 18 years ago in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968): Does the Constitution prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial? See *id.*, at 520, n. 18; *Bumper* v. *North Carolina*, 391 U. S. 543, 545 (1968). We hold that it does not.

Respondent Ardia McCree filed a habeas corpus petition in the United States District Court for the Eastern District of Arkansas claiming that such removal for cause violated the Sixth and Fourteenth Amendments and, after McCree's case was consolidated with another habeas case involving the same claim on remand from the Court of Appeals for the Eighth Circuit, the District Court ruled in McCree's favor and granted habeas relief. *Grigsby* v. *Mabry*, 569 F. Supp. 1273 (1983). A sharply divided Eighth Circuit affirmed, *Grigsby* v. *Mabry*, 758 F. 2d 226 (1985) (en banc), creating a conflict with recent decisions of the Fourth, Fifth, Seventh, and Eleventh Circuits. See *Keeten* v. *Garrison*, 742 F. 2d 129, 133–135 (CA4 1984), cert. pending, No. 84–6187; *Smith* v. *Balkcom*, 660 F. 2d 573, 576–578 (CA5 1981), modified on other grounds, 671 F. 2d 858, cert. denied *sub nom. Tison* v. *Arizona*, 459 U. S. 882 (1982); *Spinkellink* v. *Wainwright*, 578 F. 2d 582, 594 (CA5 1978), cert. denied, 440 U. S. 976 (1979); *United States ex rel. Clark* v. *Fike*, 538 F. 2d 750, 761–762 (CA7 1976), cert. denied, 429 U. S. 1064 (1977); and *Corn* v. *Zant*, 708 F. 2d 549, 564 (CA11 1983), cert. denied, 467 U. S. 1220 (1984). We granted certiorari to resolve the conflict, 474 U. S. 816 (1985), and now reverse the judgment of the Eighth Circuit.

On the morning of February 14, 1978, a combination gift shop and service station in Camden, Arkansas, was robbed,

and Evelyn Boughton, the owner, was shot and killed. That afternoon, Ardia McCree was arrested in Hot Springs, Arkansas, after a police officer saw him driving a maroon and white Lincoln Continental matching an eyewitness' description of the getaway car used by Boughton's killer. The next evening, McCree admitted to police that he had been at Boughton's shop at the time of the murder. He claimed, however, that a tall black stranger wearing an overcoat first asked him for a ride, then took McCree's rifle out of the back of the car and used it to kill Boughton. McCree also claimed that, after the murder, the stranger rode with McCree to a nearby dirt road, got out of the car, and walked away with the rifle. McCree's story was contradicted by two eyewitnesses who saw McCree's car between the time of the murder and the time when McCree said the stranger got out and walked away, and who stated that they saw only one person in the car. The police found McCree's rifle and a bank bag from Boughton's shop alongside the dirt road. Based on ballistics tests, a Federal Bureau of Investigation officer testified that the bullet that killed Boughton had been fired from McCree's rifle.

McCree was charged with capital felony murder in violation of Ark. Stat. Ann. § 41–1501(1)(a) (1977). In accordance with Arkansas law, see *Neal* v. *State,* 259 Ark. 27, 31, 531 S. W. 2d 17, 21 (1975), the trial judge at *voir dire* removed for cause, over McCree's objections, those prospective jurors who stated that they could not under any circumstances vote for the imposition of the death penalty. Eight prospective jurors were excluded for this reason. The jury convicted McCree of capital felony murder, but rejected the State's request for the death penalty, instead setting McCree's punishment at life imprisonment without parole. McCree's conviction was affirmed on direct appeal, *McCree* v. *State,* 266 Ark. 465, 585 S. W. 2d 938 (1979), and his petition for state postconviction relief was denied.

McCree then filed a federal habeas corpus petition raising, *inter alia*, the claim that "death qualification," or the removal for cause of the so-called "*Witherspoon*-excludable" prospective jurors,[1] violated his right under the Sixth and Fourteenth Amendments to have his guilt or innocence determined by an impartial jury selected from a representative cross section of the community. By stipulation of the parties, this claim was consolidated with another pending habeas case involving the same claim, which had been remanded by the Eighth Circuit for an evidentiary hearing in the District Court. App. 9–11; *Grigsby* v. *Mabry*, 637 F. 2d 525 (1980). The District Court denied the remainder of McCree's petition, and the Eighth Circuit affirmed. *McCree* v. *Housewright*, 689 F. 2d 797 (1982), cert. denied, 460 U. S. 1088 (1983).

The District Court held a hearing on the "death qualification" issue in July 1981, receiving in evidence numerous social science studies concerning the attitudes and beliefs of "*Witherspoon*-excludables," along with the potential effects of excluding them from the jury prior to the guilt phase of a bifurcated capital trial. In August 1983, the court concluded, based on the social science evidence, that "death qualification" produced juries that "were more prone to convict" capital defendants than "non-death-qualified" juries. *Grigsby* v. *Mabry*, 569 F. Supp., at 1323. The court ruled

---

[1] In *Wainwright* v. *Witt*, 469 U. S. 412 (1985), this Court emphasized that the Constitution does not require "ritualistic adherence" to the "talismanic" standard for juror exclusion set forth in footnote 21 of the *Witherspoon* opinion. 469 U. S., at 419, 423. Rather, the proper constitutional standard is simply whether a prospective juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.*, at 433, quoting *Adams* v. *Texas*, 448 U. S. 38, 45 (1980). Thus, the term "*Witherspoon*-excludable" is something of a misnomer. Nevertheless, because the parties and the courts below have used the term "*Witherspoon*-excludables" to identify the group of prospective jurors at issue in this case, we will use the same term in this opinion.

that "death qualification" thus violated both the fair-cross-section and impartiality requirements of the Sixth and Fourteenth Amendments, and granted McCree habeas relief. *Id.*, at 1324.[2]

The Eighth Circuit found "substantial evidentiary support" for the District Court's conclusion that the removal for cause of *"Witherspoon-*excludables" resulted in "conviction-prone" juries, and affirmed the grant of habeas relief on the ground that such removal for cause violated McCree's constitutional right to a jury selected from a fair cross section of the community. *Grigsby* v. *Mabry*, 758 F. 2d, at 229. The Eighth Circuit did not address McCree's impartiality claim. *Ibid.* The Eighth Circuit left it up to the discretion of the State "to construct a fair process" for future capital trials that would comply with the Sixth Amendment. *Id.*, at 242–243. Four judges dissented. *Id.*, at 243–251.

Before turning to the legal issues in the case, we are constrained to point out what we believe to be several serious flaws in the evidence upon which the courts below reached the conclusion that "death qualification" produces "conviction-prone" juries.[3] McCree introduced into evi-

---

[2] James Grigsby, the habeas petitioner with whose case McCree's had been consolidated, died prior to the District Court's decision, so his case became moot. *Grigsby* v. *Mabry*, 569 F. Supp., at 1277, n. 2. Dewayne Hulsey, a third habeas petitioner whose "death qualification" claim was consolidated with Grigsby's and McCree's, was found to be procedurally barred, under *Wainwright* v. *Sykes*, 433 U. S. 72 (1977), from asserting the claim. *Hulsey* v. *Sargent*, 550 F. Supp. 179 (ED Ark. 1981).

[3] McCree argues that the "factual" findings of the District Court and the Eighth Circuit on the effects of "death qualification" may be reviewed by this Court only under the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a). Because we do not ultimately base our decision today on the invalidity of the lower courts' "factual" findings, we need not decide the "standard of review" issue. We are far from persuaded, however, that the "clearly erroneous" standard of Rule 52(a) applies to the kind of "legislative" facts at issue here. See generally *Dunagin* v. *City of Oxford, Mississippi*, 718 F. 2d 738, 748, n. 8 (CA5 1983) (en banc) (plurality opinion of Reavley, J.). The difficulty with applying such a standard to

dence some 15 social science studies in support of his con-
stitutional claims, but only 6 of the studies even purported to
measure the potential effects on the guilt-innocence deter-
mination of the removal from the jury of *"Witherspoon-
excludables."*[4] Eight of the remaining nine studies dealt
solely with generalized attitudes and beliefs about the death
penalty and other aspects of the criminal justice system, and
were thus, at best, only marginally relevant to the constitu-
tionality of McCree's conviction.[5] The 15th and final study

---

"legislative" facts is evidenced here by the fact that at least one other
Court of Appeals, reviewing the same social science studies as introduced
by McCree, has reached a conclusion contrary to that of the Eighth Circuit.
See *Keeten* v. *Garrison*, 742 F. 2d 129, 133, n. 7 (CA4 1984) (disagreeing
that studies show relationship between generalized attitudes and behavior
as jurors), cert. pending, No. 84–6187.

[4] The Court of Appeals described the following studies as "conviction-
proneness surveys": H. Zeisel, Some Data on Juror Attitudes Toward Cap-
ital Punishment (University of Chicago Monograph 1968) (Zeisel); W. Wil-
son, Belief in Capital Punishment and Jury Performance (unpublished
manuscript, University of Texas, 1964) (Wilson); Goldberg, Toward Ex-
pansion of *Witherspoon:* Capital Scruples, Jury Bias, and Use of Psycho-
logical Data to Raise Presumptions in the Law, 5 Harv. Civ. Rights-Civ.
Lib. L. Rev. 53 (1970) (Goldberg); Jurow, New Data on the Effect of a
"Death Qualified" Jury on the Guilt Determination Process, 84 Harv. L.
Rev. 567 (1971) (Jurow); and Cowan, Thompson, & Ellsworth, The Effects
of Death Qualification on Jurors' Predisposition to Convict and on the Qual-
ity of Deliberation, 8 Law & Hum. Behav. 53 (1984) (Cowan-Deliberation).
In addition, McCree introduced evidence on this issue from a Harris Sur-
vey conducted in 1971. Louis Harris & Associates, Inc., Study No. 2016
(1971) (Harris-1971).

[5] The Court of Appeals described the following studies as "attitudinal
and demographic surveys": Bronson, On the Conviction Proneness and
Representativeness of the Death-Qualified Jury: An Empirical Study of
Colorado Veniremen, 42 U. Colo. L. Rev. 1 (1970); Bronson, Does the Ex-
clusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to
Convict? Some Evidence from California, 3 Woodrow Wilson L. J. 11
(1980); Fitzgerald & Ellsworth, Due Process vs. Crime Control: Death
Qualification and Jury Attitudes, 8 Law & Hum. Behav. 31 (1984); and Pre-
cision Research, Inc., Survey No. 1286 (1981). In addition, McCree intro-
duced evidence on these issues from Thompson, Cowan, Ellsworth, & Har-

dealt with the effects on prospective jurors of *voir dire* questioning about their attitudes toward the death penalty,[6] an issue McCree raised in his brief to this Court but that counsel for McCree admitted at oral argument would not, standing alone, give rise to a constitutional violation.[7]

Of the six studies introduced by McCree that at least purported to deal with the central issue in this case, namely, the potential effects on the determination of guilt or innocence of excluding "*Witherspoon*-excludables" from the jury, three were also before this Court when it decided *Witherspoon*.[8] There, this Court reviewed the studies and concluded:

> "The data adduced by the petitioner . . . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors

---

rington, Death Penalty Attitudes and Conviction Proneness, 8 Law & Hum. Behav. 95 (1984); Ellsworth, Bukaty, Cowan, & Thompson, The Death-Qualified Jury and the Defense of Insanity, 8 Law & Hum. Behav. 81 (1984); A. Young, Arkansas Archival Study (unpublished, 1981); and various Harris, Gallup, and National Opinion Research Center polls conducted between 1953 and 1981.

[6] McCree introduced evidence on this issue from Haney, On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process, 8 Law & Hum. Behav. 121 (1984).

[7] We would in any event reject the argument that the very process of questioning prospective jurors at *voir dire* about their views of the death penalty violates the Constitution. McCree concedes that the State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence. *Ipso facto*, the State must be given the opportunity to identify such prospective jurors by questioning them at *voir dire* about their views of the death penalty.

[8] The petitioner in *Witherspoon* cited the Wilson and Goldberg studies, and a prepublication draft of the Zeisel study. 391 U. S., at 517, n. 10; see n. 4, *supra.*

opposed to capital punishment results in an unrepre-
sentative jury on the issue of guilt or substantially in-
creases the risk of conviction. In light of the presently
available information, we are not prepared to announce a
*per se* constitutional rule requiring the reversal of every
conviction returned by a jury selected as this one was."
391 U. S. at 517–518 (footnote omitted).

It goes almost without saying that if these studies were "too
tentative and fragmentary" to make out a claim of constitu-
tional error in 1968, the same studies, unchanged but for hav-
ing aged some 18 years, are still insufficient to make out such
a claim in this case.

Nor do the three post-*Witherspoon* studies introduced by
McCree on the "death qualification" issue provide substantial
support for the *"per se* constitutional rule" McCree asks this
Court to adopt. All three of the "new" studies were based
on the responses of individuals randomly selected from some
segment of the population, but who were not actual jurors
sworn under oath to apply the law to the facts of an actual
case involving the fate of an actual capital defendant.[9] We
have serious doubts about the value of these studies in pre-
dicting the behavior of actual jurors. See *Grigsby* v. *Mabry*,
758 F. 2d, at 248, n. 7 (J. Gibson, J., dissenting). In addi-
tion, two of the three "new" studies did not even attempt to
simulate the process of jury deliberation,[10] and none of the
"new" studies was able to predict to what extent, if any, the
presence of one or more *"Witherspoon*-excludables" on a

---

[9] The Harris-1971 study polled 2,068 adults from throughout the United
States, the Cowan-Deliberation study involved 288 jury-eligible residents
of San Mateo and Santa Clara Counties in California, and the Jurow study
was based on the responses of 211 employees of the Sperry Rand Corpora-
tion in New York.

[10] The Harris-1971 and Jurow studies did not allow for group delibera-
tion, but rather measured only individual responses.

guilt-phase jury would have altered the outcome of the guilt determination.[11]

Finally, and most importantly, only one of the six "death qualification" studies introduced by McCree even attempted to identify and account for the presence of so-called "nullifiers," or individuals who, because of their deep-seated opposition to the death penalty, would be unable to decide a capital defendant's guilt or innocence fairly and impartially.[12] McCree concedes, as he must, that "nullifiers" may properly be excluded from the guilt-phase jury, and studies that fail to take into account the presence of such "nullifiers" thus are fatally flawed.[13] Surely a *"per se* constitutional rule" as far

---

[11] JUSTICE MARSHALL's dissent refers to an "essential unanimity" of support among social science researchers and other academics for McCree's assertion that "death qualification" has a significant effect on the outcome of jury deliberations at the guilt phase of capital trials. See *post*, at 189. At least one of the articles relied upon by the dissent candidly acknowledges, however, that its conclusions ultimately must rest on "[a] certain amount of . . . conjecture" and a willingness "to transform behavioral suspicions into doctrine." Finch & Ferraro, The Empirical Challenge to Death-Qualified Juries: On Further Examination, 65 Neb. L. Rev. 21, 67 (1986). As the authors of the article explain:

"[U]ncertainty inheres in every aspect of the capital jury's operation, whether one focuses on the method of identifying excludable jurors or the deliberative process through which verdicts are reached. So it is that, some seventeen years after *Witherspoon*, no definitive conclusions can be stated as to the frequency or the magnitude of the effects of death qualification.

.    .    .    .    .

"Nor is it likely that further empirical research can add significantly to the current understanding of death qualification. The true magnitude of the phenomenon of conviction proneness is probably unmeasurable, given the complexity of capital cases and capital adjudication." *Id.*, at 66–67 (footnote omitted).

[12] Only the Cowan-Deliberation study attempted to take into account the presence of "nullifiers."

[13] The effect of this flaw on the outcome of a particular study is likely to be significant. The Cowan-Deliberation study revealed that approximately 37% of the "*Witherspoon*-excludables" identified in the study were also "nullifiers."

reaching as the one McCree proposes should not be based on the results of the lone study that avoids this fundamental flaw.

Having identified some of the more serious problems with McCree's studies, however, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death-qualified" juries. We hold, nonetheless, that the Constitution does not prohibit the States from "death qualifying" juries in capital cases.

The Eighth Circuit ruled that "death qualification" violated McCree's right under the Sixth Amendment, as applied to the States via incorporation through the Fourteenth Amendment, see *Duncan* v. *Louisiana*, 391 U. S. 145, 148–158 (1968), to a jury selected from a representative cross section of the community. But we do not believe that the fair-cross-section requirement can, or should, be applied as broadly as that court attempted to apply it. We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. See *Duren* v. *Missouri*, 439 U. S. 357, 363–364 (1979); *Taylor* v. *Louisiana*, 419 U. S. 522, 538 (1975) ("[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population"); cf. *Batson* v. *Kentucky*, *ante*, at 84–85, n. 4 (expressly declining to address "fair-cross-section" challenge to discriminatory use of peremptory challenges).[14] The limited

---

[14] The only case in which we have intimated that the fair-cross-section requirement might apply outside the context of jury panels or venires, *Ballew* v. *Georgia*, 435 U. S. 223 (1978) (opinion of BLACKMUN, J.), did not involve jury *selection* at all, but rather the *size* of the petit jury. JUSTICE BLACKMUN's opinion announcing the judgment, and the opinions concurring in the judgment which agreed with him, expressed the view that Georgia's limitation of the size of juries to five "prevents juries from truly representing their communities," *id.*, at 239.

scope of the fair-cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly "representative" petit jury, see *ante*, at 85–86, n. 6, a basic truth that the Court of Appeals itself acknowledged for many years prior to its decision in the instant case. See *United States* v. *Childress*, 715 F. 2d 1313 (CA8 1983) (en banc), cert. denied, 464 U. S. 1063 (1984); *Pope* v. *United States*, 372 F. 2d 710, 725 (CA8 1967) (Blackmun, J.) ("The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn"), vacated on other grounds, 392 U. S. 651 (1968). We remain convinced that an extension of the fair-cross-section requirement to petit juries would be unworkable and unsound, and we decline McCree's invitation to adopt such an extension.

But even if we were willing to extend the fair-cross-section requirement to petit juries, we would still reject the Eighth Circuit's conclusion that "death qualification" violates that requirement. The essence of a "fair-cross-section" claim is the systematic exclusion of "a 'distinctive' group in the community." *Duren, supra,* at 364. In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the "*Witherspoon*-excludables" at issue here, are not "distinctive groups" for fair-cross-section purposes.

We have never attempted to precisely define the term "distinctive group," and we do not undertake to do so today. But we think it obvious that the concept of "distinctiveness" must be linked to the purposes of the fair-cross-section requirement. In *Taylor, supra,* we identified those purposes as (1) "guard[ing] against the exercise of arbitrary power" and ensuring that the "commonsense judgment of the community" will act as "a hedge against the overzealous or mistaken prosecutor," (2) preserving "public confidence in the

fairness of the criminal justice system," and (3) implementing our belief that "sharing in the administration of justice is a phase of civic responsibility." *Id.*, at 530–531.

Our prior jury-representativeness cases, whether based on the fair-cross-section component of the Sixth Amendment or the Equal Protection Clause of the Fourteenth Amendment, have involved such groups as blacks, see *Peters* v. *Kiff*, 407 U. S. 493 (1972) (opinion of MARSHALL, J.) (equal protection); women, see *Duren, supra* (fair cross section); *Taylor, supra* (same); and Mexican-Americans, see *Castaneda* v. *Partida*, 430 U. S. 482 (1977) (equal protection). The wholesale exclusion of these large groups from jury service clearly contravened all three of the aforementioned purposes of the fair-cross-section requirement. Because these groups were excluded for reasons completely unrelated to the ability of members of the group to serve as jurors in a particular case, the exclusion raised at least the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community. In addition, the exclusion from jury service of large groups of individuals not on the basis of their inability to serve as jurors, but on the basis of some immutable characteristic such as race, gender, or ethnic background, undeniably gave rise to an "appearance of unfairness." Finally, such exclusion improperly deprived members of these often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases.

The group of "*Witherspoon*-excludables" involved in the case at bar differs significantly from the groups we have previously recognized as "distinctive." "Death qualification," unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of

a capital trial.[15]   There is very little danger, therefore, and McCree does not even argue, that "death qualification" was instituted as a means for the State to arbitrarily skew the composition of capital-case juries.[16]

Furthermore, unlike blacks, women, and Mexican-Americans, "*Witherspoon*-excludables" are singled out for exclusion in capital cases on the basis of an attribute that is within the individual's control.   It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.   Because the group of "*Witherspoon*-excludables" includes only those who cannot and will not conscientiously obey the law with respect to one of the issues in a capital case, "death qualification" hardly can be said to create an "appearance of unfairness."

Finally, the removal for cause of "*Witherspoon*-excludables" in capital cases does not prevent them from serving as jurors in other criminal cases, and thus leads to no substantial deprivation of their basic rights of citizenship. They are treated no differently than any juror who expresses the view that he would be unable to follow the law in a particular case.

In sum, "*Witherspoon*-excludables," or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a

---

[15] See *Rector* v. *State*, 280 Ark. 385, 396–397, 659 S. W. 2d 168, 173–174 (1983), cert. denied, 466 U. S. 988 (1984).   McCree does not dispute the existence of this interest, but merely contends that it is not substantial. See Brief for Respondent 74–79.

[16] McCree asserts that the State often will request the death penalty in particular cases solely for the purpose of "death qualifying" the jury, with the intent ultimately to "waive" the death penalty after a conviction is obtained.   We need not consider the implications of this assertion, since the State did not "waive" the death penalty in McCree's case.

particular case, may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement. See *Lockett* v. *Ohio*, 438 U. S. 586, 597 (1978) ("Nothing in *Taylor*, however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge"). It is for this reason that we conclude that "*Witherspoon*-excludables" do not constitute a "distinctive group" for fair-cross-section purposes, and hold that "death qualification" does not violate the fair-cross-section requirement.

McCree argues that, even if we reject the Eighth Circuit's fair-cross-section holding, we should affirm the judgment below on the alternative ground, adopted by the District Court, that "death qualification" violated his constitutional right to an impartial jury. McCree concedes that the individual jurors who served at his trial were impartial, as that term was defined by this Court in cases such as *Irvin* v. *Dowd*, 366 U. S. 717, 723 (1961) ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court"), and *Reynolds* v. *United States*, 98 U. S. 145 (1879). He does not claim that pretrial publicity, see *Rideau* v. *Louisiana*, 373 U. S. 723 (1963), *ex parte* communications, see *Remmer* v. *United States*, 347 U. S. 227 (1954), or other undue influence, see *Estes* v. *Texas*, 381 U. S. 532 (1965), affected the jury's deliberations. In short, McCree does not claim that his conviction was tainted by any of the kinds of jury bias or partiality that we have previously recognized as violative of the Constitution. Instead, McCree argues that his jury lacked impartiality because the absence of "*Witherspoon*-excludables" "slanted" the jury in favor of conviction.

We do not agree. McCree's "impartiality" argument apparently is based on the theory that, because all individual jurors are to some extent predisposed towards one result or another, a constitutionally impartial *jury* can be constructed

only by "balancing" the various predispositions of the individual *jurors*. Thus, according to McCree, when the State "tips the scales" by excluding prospective jurors with a particular viewpoint, an impermissibly partial jury results. We have consistently rejected this view of jury impartiality, including as recently as last Term when we squarely held that an impartial *jury* consists of nothing more than *"jurors* who will conscientiously apply the law and find the facts." *Wainwright* v. *Witt*, 469 U. S. 412, 423 (1985) (emphasis added); see also *Smith* v. *Phillips*, 455 U. S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it"); *Irvin* v. *Dowd, supra*, at 722 ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors").

The view of jury impartiality urged upon us by McCree is both illogical and hopelessly impractical. McCree characterizes the jury that convicted him as "slanted" by the process of "death qualification." But McCree admits that exactly the same 12 individuals could have ended up on his jury through the "luck of the draw," without in any way violating the constitutional guarantee of impartiality. Even accepting McCree's position that we should focus on the *jury* rather than the individual *jurors*, it is hard for us to understand the logic of the argument that a given jury is unconstitutionally partial when it results from a state-ordained process, yet impartial when exactly the same jury results from mere chance. On a more practical level, if it were true that the Constitution required a certain mix of individual viewpoints on the jury, then trial judges would be required to undertake the Sisyphean task of "balancing" juries, making sure that each contains the proper number of Democrats and Republicans, young persons and old persons, white-collar executives and blue-collar laborers, and so on. Adopting McCree's concept of jury impartiality would also likely require the elimination of peremptory challenges, which are commonly used by both

the State and the defendant to attempt to produce a jury favorable to the challenger.

McCree argues, however, that this Court's decisions in *Witherspoon* and *Adams* v. *Texas*, 448 U. S. 38 (1980), stand for the proposition that a State violates the Constitution whenever it "slants" the jury by excluding a group of individuals more likely than the population at large to favor the criminal defendant. We think McCree overlooks two fundamental differences between *Witherspoon* and *Adams* and the instant case, and therefore misconceives the import and scope of those two decisions.

First, the Court in *Witherspoon* viewed the Illinois system as having been deliberately slanted for the purpose of making the imposition of the death penalty more likely. The Court said:

> "But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die.
>
> "It is, of course, settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' *Fay* v. *New York*, 332 U. S. 261, 294 [1947]. See *Tumey* v. *Ohio*, 273 U. S. 510 [1927]. It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." 391 U. S., at 520–521 (footnotes omitted).

In *Adams* v. *Texas*, *supra*, the Court explained the rationale for *Witherspoon* as follows:

> "In this context, the Court held that a State may not constitutionally execute a death sentence imposed by a jury culled of all those who revealed during *voir dire* exami-

nation that they had conscientious scruples against or were otherwise opposed to capital punishment. The State was held to have no valid interest in such a broad-based rule of exclusion, since '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him . . . and can thus obey the oath he takes as a juror.' *Witherspoon* v. *Illinois*, 391 U. S., at 519." 448 U. S., at 43.

*Adams*, in turn, involved a fairly straightforward application of the *Witherspoon* rule to the Texas capital punishment scheme. See *Adams, supra*, at 48 (Texas exclusion statute "focuses the inquiry directly on the prospective juror's beliefs about the death penalty, and hence clearly falls within the scope of the *Witherspoon* doctrine").

Here, on the other hand, the removal for cause of "*Witherspoon*-excludables" serves the State's entirely proper interest in obtaining a single jury that could impartially decide all of the issues in McCree's case. Arkansas by legislative enactment and judicial decision provides for the use of a unitary jury in capital cases. See Ark. Stat. Ann. § 41–1301(3) (1977); *Rector* v. *State*, 280 Ark. 385, 395, 659 S. W. 2d 168, 173 (1983), cert. denied, 466 U. S. 988 (1984). We have upheld against constitutional attack the Georgia capital sentencing plan which provided that the same jury must sit in both phases of a bifurcated capital murder trial, *Gregg* v. *Georgia*, 428 U. S. 153, 158, 160, 163 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.), and since then have observed that we are "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano* v. *Florida*, 468 U. S. 447, 464 (1984).

The Arkansas Supreme Court recently explained the State's legislative choice to require unitary juries in capital cases:

"It has always been the law in Arkansas, except when the punishment is mandatory, that the same jurors who have the responsibility for determining guilt or inno-

cence must also shoulder the burden of fixing the punishment. That is as it should be, for the two questions are necessarily interwoven." *Rector, supra,* at 395, 659 S. W. 2d, at 173.

Another interest identified by the State in support of its system of unitary juries is the possibility that, in at least some capital cases, the defendant might benefit at the sentencing phase of the trial from the jury's "residual doubts" about the evidence presented at the guilt phase. The dissenting opinion in the Court of Appeals also adverted to this interest:

> "[A]s several courts have observed, jurors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts . . . about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases. To divide the responsibility . . . to some degree would eliminate the influence of such doubts." 758 F. 2d, at 247–248 (J. Gibson, J., dissenting) (citations omitted).

JUSTICE MARSHALL's dissent points out that some States which adhere to the unitary jury system do not allow the defendant to argue "residual doubts" to the jury at sentencing. But while this may justify skepticism as to the extent to which such States are willing to go to allow defendants to capitalize on "residual doubts," it does not wholly vitiate the claimed interest. Finally, it seems obvious to us that in most, if not all, capital cases much of the evidence adduced at the guilt phase of the trial will also have a bearing on the penalty phase; if two different juries were to be required, such testimony would have to be presented twice, once to each jury. As the Arkansas Supreme Court has noted, "[s]uch repetitive trials could not be consistently fair to the State and perhaps not even to the accused." *Rector, supra,* at 396, 659 S. W. 2d, at 173.

Unlike the Illinois system criticized by the Court in *Witherspoon*, and the Texas system at issue in *Adams*, the Arkansas system excludes from the jury only those who may properly be excluded from the penalty phase of the deliberations under *Witherspoon*, *Adams*, and *Wainwright* v. *Witt*, 469 U. S. 412 (1985).[17] That State's reasons for adhering to its preference for a single jury to decide both the guilt and penalty phases of a capital trial are sufficient to negate the inference which the Court drew in *Witherspoon* concerning the lack of any neutral justification for the Illinois rule on jury challenges.

Second, and more importantly, both *Witherspoon* and *Adams* dealt with the special context of capital sentencing, where the range of jury discretion necessarily gave rise to far greater concern over the possible effects of an "imbalanced" jury. As we emphasized in *Witherspoon*:

> "[I]n Illinois, as in other States, the jury is given broad discretion to decide whether or not death *is* 'the proper penalty' in a given case, and a juror's general views about capital punishment play an inevitable role in any such decision.
>
> ". . . . Guided by neither rule nor standard, 'free to select or reject as it [sees] fit,' a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." 391 U. S., at 519 (emphasis in original; footnotes omitted).

Because capital sentencing under the Illinois statute involved such an exercise of essentially unfettered discretion, we held that the State violated the Constitution when it "crossed the

---

[17] The rule applied by Arkansas to exclude these prospective jurors was scarcely a novel one; as long ago as *Logan* v. *United States*, 144 U. S. 263 (1892), this Court approved such a practice in the federal courts, commenting that it was also followed "by the courts of every State in which the question has arisen." *Id.*, at 298.

line of neutrality" and "produced a jury uncommonly willing to condemn a man to die." *Id.*, at 520–521.

In *Adams*, we applied the same basic reasoning to the Texas capital sentencing scheme, which, although purporting to limit the jury's role to answering several "factual" questions, in reality vested the jury with considerable discretion over the punishment to be imposed on the defendant. See 448 U. S., at 46 ("This process is not an exact science, and the jurors under the Texas bifurcated procedure unavoidably exercise a range of judgment and discretion while remaining true to their instructions and their oaths"); cf. *Jurek* v. *Texas*, 428 U. S. 262, 273 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.) ("Texas law essentially requires that . . . in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it"). Again, as in *Witherspoon*, the discretionary nature of the jury's task led us to conclude that the State could not "exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty." *Adams*, 448 U. S., at 50.

In the case at bar, by contrast, we deal not with capital sentencing, but with the jury's more traditional role of finding the facts and determining the guilt or innocence of a criminal defendant, where jury discretion is more channeled. We reject McCree's suggestion that *Witherspoon* and *Adams* have broad applicability outside the special context of capital sentencing,[18] and conclude that those two decisions do not support the result reached by the Eighth Circuit here.

In our view, it is simply not possible to define jury impartiality, for constitutional purposes, by reference to some hypothetical mix of individual viewpoints. Prospective jurors

---

[18] The majority in *Adams* rejected the dissent's claim that there was "no plausible distinction between the role of the jury in the guilt/innocence phase of the trial and its role, as defined by the State of Texas, in the sentencing phase." 448 U. S., at 54 (REHNQUIST, J., dissenting).

come from many different backgrounds, and have many different attitudes and predispositions. But the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case. We hold that McCree's jury satisfied both aspects of this constitutional standard. The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BLACKMUN concurs in the result.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

Eighteen years ago, this Court vacated the sentence of a defendant from whose jury the State had excluded all venirepersons expressing any scruples against capital punishment. Such a practice, the Court held, violated the Constitution by creating a "tribunal organized to return a verdict of death." *Witherspoon* v. *Illinois,* 391 U. S. 510, 521 (1968). The only venirepersons who could be constitutionally excluded from service in capital cases were those who "made unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment" or that they could not assess the defendant's guilt impartially. *Id.,* at 522–523, n. 21.

Respondent contends here that the "death-qualified" jury that convicted him, from which the State, as authorized by *Witherspoon,* had excluded all venirepersons unwilling to consider imposing the death penalty, was in effect "organized to return a verdict" of guilty. In support of this claim, he has presented overwhelming evidence that death-qualified juries are substantially more likely to convict or to convict on more serious charges than juries on which unalterable opponents of capital punishment are permitted to serve. Re-

spondent does not challenge the application of *Witherspoon* to the jury in the sentencing stage of bifurcated capital cases. Neither does he demand that individuals unable to assess culpability impartially ("nullifiers") be permitted to sit on capital juries. All he asks is the chance to have his guilt or innocence determined by a jury like those that sit in noncapital cases — one whose composition has not been tilted in favor of the prosecution by the exclusion of a group of prospective jurors uncommonly aware of an accused's constitutional rights but quite capable of determining his culpability without favor or bias.

With a glib nonchalance ill suited to the gravity of the issue presented and the power of respondent's claims, the Court upholds a practice that allows the State a special advantage in those prosecutions where the charges are the most serious and the possible punishments, the most severe. The State's mere announcement that it intends to seek the death penalty if the defendant is found guilty of a capital offense will, under today's decision, give the prosecution license to empanel a jury especially likely to return that very verdict. Because I believe that such a blatant disregard for the rights of a capital defendant offends logic, fairness, and the Constitution, I dissent.

I

Respondent is not the first to argue that "death qualification" poses a substantial threat to the ability of a capital defendant to receive a fair trial on the issue of his guilt or innocence. In 1961, one scholar observed that "Jurors hesitant to levy the death penalty would . . . seem more prone to resolve the many doubts as to guilt or innocence in the defendant's favor than would jurors qualified on the 'pound of flesh' approach." Oberer, Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?, 39 Texas L. Rev. 545, 549 (1961).

When he claimed that the exclusion of scrupled jurors from his venire had violated his constitutional right to an impartial

jury, the petitioner in *Witherspoon* v. *Illinois, supra,* sought to provide empirical evidence to corroborate Oberer's intuition. See Brief for Petitioner in *Witherspoon* v. *Illinois,* O. T. 1967, No. 1015, pp. 28–33. The data on this issue, however, consisted of only three studies and one preliminary summary of a study.[1] Although the data certainly supported the validity of Witherspoon's challenge to his conviction, these studies did not provide the Court with the firmest basis for constitutional adjudication. As a result, while it reversed Witherspoon's death sentence, the Court was unable to conclude that "the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction," 391 U. S., at 518, and declined to reverse Witherspoon's conviction. Nonetheless, the Court was careful to note:

> "[A] defendant convicted by [a properly death-qualified] jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution." *Id.,* at 520, n. 18.

---

[1] The *Witherspoon* Court had before it only a preliminary summary of the results of H. Zeisel, Some Data on Juror Attitudes Towards Capital Punishment (University of Chicago Monograph 1968), "not the data nor the analysis that underlay his conclusions, nor indeed his final conclusions themselves." *Hovey* v. *Superior Court,* 28 Cal. 3d 1, 30, n. 63, 616 P. 2d 1301, 1317, n. 63 (1980).

In the wake of *Witherspoon*, a number of researchers set out to supplement the data that the Court had found inadequate in that case. The results of these studies were exhaustively analyzed by the District Court in this case, see *Grigsby* v. *Mabry*, 569 F. Supp. 1273, 1291–1308 (ED Ark. 1983) *(Grigsby II)*, and can be only briefly summarized here.[2] The data strongly suggest that death qualification excludes a significantly large subset—at least 11% to 17%—of potential jurors who could be impartial during the guilt phase of trial.[3] Among the members of this excludable class are a disproportionate number of blacks and women. See *id.*, at 1283, 1293–1294.

---

[2] Most of the studies presented here were also comprehensively summarized in *Hovey* v. *Superior Court, supra.* Because the California Supreme Court found the studies had not accounted for jurors who could be excluded because they would automatically vote for the death penalty where possible, that court ultimately rejected a defendant's constitutional challenge to death qualification. But see Kadane, After *Hovey*: A Note on Taking Account of the Automatic Death Penalty Jurors, 8 Law & Hum. Behav. 115 (1984).

[3] Bronson, On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen, 12 U. Colo. L. Rev. 1 (1970) (using classification only approximating *Witherspoon* standard, and finding 11% of subjects *Witherspoon*-excludable); Bronson, Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California, 3 Woodrow Wilson L. J. 11 (1980) (using more appropriate *Witherspoon* question and finding 93% overlap of "strongly opposed" group in prior Bronson study with *Witherspoon*-excludables); Jurow, New Data on the Effect of a "Death Qualified Jury" on the Guilt Determination Process, 84 Harv. L. Rev. 567 (1971) (finding only 10% of sample excludable, but likely to have underestimated size of class in general population because sample 99% white and 80% male); Fitzgerald & Ellsworth, Due Process vs. Crime Control: Death Qualification and Jury Attitudes, 8 Law & Hum. Behav. 31 (1984) (random sample with nullifiers screened out finding 17% still excludable under *Witherspoon*); A. Young, Arkansas Archival Study (unpublished, 1981) (14% of jurors questioned in *voir dire* transcripts excludable); Precision Research, Inc., Survey No. 1286 (1981) (11% excludable, not counting nullifiers); see 569 F. Supp., at 1285; *Grigsby* v. *Mabry*, 758 F. 2d 226, 231 (CA8 1985).

The perspectives on the criminal justice system of jurors who survive death qualification are systematically different from those of the excluded jurors. Death-qualified jurors are, for example, more likely to believe that a defendant's failure to testify is indicative of his guilt, more hostile to the insanity defense, more mistrustful of defense attorneys, and less concerned about the danger of erroneous convictions. *Id.*, at 1283, 1293, 1304. This proprosecution bias is reflected in the greater readiness of death-qualified jurors to convict or to convict on more serious charges. *Id.*, at 1294–1302; *Grigsby* v. *Mabry*, 758 F. 2d 226, 233–236 (CA8 1985). And, finally, the very process of death qualification—which focuses attention on the death penalty before the trial has even begun—has been found to predispose the jurors that survive it to believe that the defendant is guilty. 569 F. Supp., at 1302–1305; 758 F. 2d, at 234.

The evidence thus confirms, and is itself corroborated by, the more intuitive judgments of scholars and of so many of the participants in capital trials—judges, defense attorneys, and prosecutors. See 569 F. Supp., at 1322.[4]

---

[4] The Court reasons that because the State did not "waive" the death penalty in respondent's case, we "need not consider the implications" of respondent's assertion that "the State often will request the death penalty in particular cases solely for the purpose of 'death qualifying' the jury, with the intent ultimately to 'waive' the death penalty after a conviction is obtained." *Ante*, at 176, n. 16. If, by this, the Court intended to limit the effects of its decision to the case pending before us, I would gladly join that effort. However, I see all too few indications in the Court's opinion that future constitutional challenges to death-qualified juries stand much chance of success here. In view of the sweep of the Court's opinion and the fact that, in any particular case, a defendant will never be able to demonstrate with any certainty that the prosecution's decision to seek the death penalty was merely a tactical ruse, I find the Court's refusal to consider the potential for this abuse rather disingenuous. See *Grigsby* v. *Mabry*, 483 F. Supp. 1372, 1389, n. 24 (ED Ark. 1980) *(Grigsby I)* (suggesting possibility that prosecutor had initially sought death penalty merely to get more conviction-prone, death-qualified jury). Cf. Oberer, Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of

## II

## A

Respondent's case would of course be even stronger were he able to produce data showing the prejudical effects of death qualification upon actual trials. Yet, until a State permits two separate juries to deliberate on the same capital case and return simultaneous verdicts, defendants claiming prejudice from death qualification should not be denied recourse to the only available means of proving their case, recreations of the *voir dire* and trial processes. See *Grigsby* v. *Mabry, supra,* at 237 ("[I]t is the courts who have often stood in the way of surveys involving real jurors and we should not now reject a study because of this deficiency").

The chief strength of respondent's evidence lies in the essential unanimity of the results obtained by researchers using diverse subjects and varied methodologies. Even the Court's haphazard jabs cannot obscure the power of the array. Where studies have identified and corrected apparent flaws in prior investigations, the results of the subsequent work have only corroborated the conclusions drawn in the earlier efforts. Thus, for example, some studies might be faulted for failing to distinguish within the class of *Witherspoon*-excludables, between nullifiers (whom respondent concedes may be excluded from the guilt phase) and those who could assess guilt impartially. Yet their results are entirely consistent with those obtained after nullifiers had indeed been excluded. See, *e. g.,* Cowan, Thompson, & Ellsworth, The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation, 8 Law & Hum. Behav. 53 (1984). And despite the failure of certain studies to "allow for group deliberations," *ante,* at

Fair Trial on Issue of Guilt?, 39 Texas L. Rev. 545, 555, n. 45b (1961) (reporting testimony of one prosecutor that there might be other prosecutors who death-qualified a jury "without hope of obtaining a death verdict but in the expectation that a jury so selected would impose a higher penalty than might otherwise be obtained").

171, n. 10, the value of their results is underscored by the discovery that initial verdict preferences, made prior to group deliberations, are a fair predictor of how a juror will vote when faced with opposition in the jury room. See Cowan, Thompson, & Ellsworth, *supra*, at 68–69; see also R. Hastie, S. Penrod, & N. Pennington, Inside the Jury 66 (1983); H. Kalven & H. Zeisel, The American Jury 488 (1966).

The evidence adduced by respondent is quite different from the "tentative and fragmentary" presentation that failed to move this Court in *Witherspoon.* 391 U. S., at 517. Moreover, in contrast to *Witherspoon*, the record in this case shows respondent's case to have been "subjected to the traditional testing mechanisms of the adversary process," *Ballew* v. *Georgia* 435 U. S. 223, 246 (1978) (POWELL, J., concurring in judgment). At trial, respondent presented three expert witnesses and one lay witness in his case in chief, and two additional lay witnesses in his rebuttal. Testimony by these witnesses permitted the District Court, and allows this Court, better to understand the methodologies used here and their limitations. Further testing of respondent's empirical case came at the hands of the State's own expert witnesses. Yet even after considering the evidence adduced by the State, the Court of Appeals properly noted: "there are no studies which contradict the studies submitted [by respondent]; in other words, all of the documented studies support the district court's findings." 758 F. 2d, at 238.

## B

The true impact of death qualification on the fairness of a trial is likely even more devastating than the studies show. *Witherspoon* placed limits on the State's ability to strike scrupled jurors for cause, unless they state "unambiguously that [they] would automatically vote against the imposition of capital punishment no matter what the trial might reveal," 391 U. S., at 516, n. 9. It said nothing, however, about the prosecution's use of peremptory challenges to eliminate ju-

rors who do not meet that standard and would otherwise survive death qualification. See Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1, 85, n. 391 (1980). There is no question that peremptories have indeed been used to this end, thereby expanding the class of scrupled jurors excluded as a result of the death-qualifying *voir dire* challenged here. See, *e. g.*, *People* v. *Velasquez*, 26 Cal. 3d 425, 438, n. 9, 606 P. 2d 341, 348, n. 9 (1980) (prosecutor informed court during *voir dire* that if a venireperson expressing scruples about the death penalty "were not a challenge for cause, I would kick her off on a peremptory challenge"). The only study of this practice has concluded: "For the five-year period studied a prima facie case has been demonstrated that prosecutors in Florida's Fourth Judicial Circuit systematically used their peremptory challenges to eliminate from capital juries venirepersons expressing opposition to the death penalty." Winick, Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis, 81 Mich. L. Rev. 1, 39 (1982).[5]

Judicial applications of the *Witherspoon* standard have also expanded the class of jurors excludable for cause. While the studies produced by respondent generally classified a subject as a *Witherspoon*-excludable only upon his unambiguous refusal to vote death under any circumstance, the courts have never been so fastidious. Trial and appellate courts have frequently excluded jurors even in the absence of unambiguous expressions of their absolute opposition to capital punishment. Schnapper, Taking *Witherspoon* Seriously: The Search for Death-Qualified Jurors, 62 Texas L. Rev. 977,

---

[5] At this point, the remedy called for is not the wholesale removal of the prosecution's power to make peremptory challenges, but merely the elimination of death qualification. But cf. *Batson* v. *Kentucky*, *ante*, p. 102 (MARSHALL, J., concurring). Without the extensive *voir dire* now allowed for death qualification, the prosecution would lack sufficient information to be able to expand the scope of *Witherspoon* through the use of peremptories. See n. 8, *infra*.

993–1032 (1984). And this less demanding approach will surely become more common in the wake of this Court's decision in *Wainwright* v. *Witt*, 469 U. S. 412 (1985). Under *Witt*, a juror who does not make his attitude toward capital punishment "unmistakably clear," *Witherspoon*, 391 U. S., at 522, n. 21, may nonetheless be excluded for cause if the trial court is left with the impression that his attitude will "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, *supra*, at 433 (quoting *Adams* v. *Texas*, 448 U. S. 38, 45 (1980)). It thus "seems likely that *Witt* will lead to more conviction-prone panels" since "'scrupled' jurors — those who generally oppose the death penalty but do not express an unequivocal refusal to impose it — usually share the pro-defendant perspective of excludable jurors." See Finch & Ferraro, The Empirical Challenge to Death Qualified Juries: On Further Examination, 65 Neb. L. Rev. 21, 63 (1986).

## C

Faced with the near unanimity of authority supporting respondent's claim that death qualification gives the prosecution a particular advantage in the guilt phase of capital trials, the majority here makes but a weak effort to contest that proposition. Instead, it merely assumes for the purposes of this opinion "that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries," *ante*, at 173, and then holds that this result does not offend the Constitution. This disregard for the clear import of the evidence tragically misconstrues the settled constitutional principles that guarantee a defendant the right to a fair trial and an impartial jury whose composition is not biased toward the prosecution.

## III

In *Witherspoon* the Court observed that a defendant convicted by a jury from which those unalterably opposed to the death penalty had been excluded "might still attempt to es-

tablish that the jury was less than neutral with respect to *guilt*." 391 U. S., at 520, n. 18. Respondent has done just that. And I believe he has succeeded in proving that his trial by a jury so constituted violated his right to an impartial jury, guaranteed by both the Sixth Amendment and principles of due process, see *Ristaino* v. *Ross*, 424 U. S. 589, 595, n. 6 (1976). We therefore need not rely on respondent's alternative argument that death qualification deprived him of a jury representing a fair cross section of the community.[6]

## A

Respondent does not claim that any individual on the jury that convicted him fell short of the constitutional standard for impartiality. Rather, he contends that, by systematically excluding a class of potential jurors less prone than the population at large to vote for conviction, the State gave itself an unconstitutional advantage at his trial. Thus, according to respondent, even though a nonbiased selection procedure might have left him with a jury composed of the very same

---

[6] With respect to the Court's discussion of respondent's fair-cross-section claim, however, I must note that there is no basis in either precedent or logic for the suggestion that a state law authorizing the prosecution before trial to exclude from jury service all, or even a substantial portion of, the members of a "distinctive group" would not constitute a clear infringement of a defendant's Sixth Amendment right. "The desired interaction of a cross section of the community does not take place within the venire; it is only effectuated by the jury that is selected and sworn to try the issues." *McCray* v. *New York*, 461 U. S. 961, 968 (1983) (MARSHALL, J., dissenting from denial of certiorari); see *McCray* v. *Abrams*, 750 F. 2d 1113, 1128–1129 (CA2 1984), cert. pending, No. 84–1426. The right to have a particular group represented on venires is of absolutely no value if every member of that group will automatically be excluded from service as soon as he is found to be a member of that group. Whether a violation of the fair-cross-section requirement has occurred can hardly turn on *when* the wholesale exclusion of a group takes place. If, for example, blacks were systematically struck from petit juries pursuant to state law, the effect—and the infringement of a defendant's Sixth Amendment rights—would be the same as if they had never been included on venires in the first place.

individuals that actually sat on his panel, the process by which those 12 individuals were chosen violated the Constitution.

I am puzzled by the difficulty that the majority has in understanding the "logic of the argument." *Ante,* at 178. For the logic is precisely that which carried the day in *Witherspoon,* and which has never been repudiated by this Court—not even today, if the majority is to be taken at its word. There was no question in *Witherspoon* that if the defendant's jury had been chosen by the "luck of the draw," the same 12 jurors who actually sat on his case might have been selected. Nonetheless, because the State had removed from the pool of possible jurors all those expressing general opposition to the death penalty, the Court overturned the defendant's conviction, declaring "that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." 391 U. S., at 521. Witherspoon had been denied a fair sentencing determination, the Court reasoned, not because any member of his jury lacked the requisite constitutional impartiality, but because the manner in which that jury had been selected "stacked the deck" against him. *Id.,* at 523. Here, respondent adopts the approach of the *Witherspoon* Court and argues simply that the State entrusted the determination of his guilt and the level of his culpability to a tribunal organized to convict.

The Court offers but two arguments to rebut respondent's constitutional claim. First, it asserts that the "State's reasons for adhering to its preference for a single jury to decide both the guilt and penalty phases of a capital trial are sufficient to negate the inference which the Court drew in *Witherspoon* concerning the lack of any neutral justification for the Illinois rule on jury challenges." *Ante,* at 182. This argument, however, does not address the question whether death qualification infringes a defendant's constitutional interest in "a completely fair determination of guilt or innocence,"

*Witherspoon,* 391 U. S., at 520, n. 18. It merely indicates the state interest that must be considered once an infringement of that constitutional interest is found.

The Court's second reason for rejecting respondent's challenge to the process that produced his jury is that the notion of "neutrality" adumbrated in *Witherspoon* must be confined to "the special context of capital sentencing, where the range of jury discretion necessarily gave rise to far greater concern over the possible effects of an 'imbalanced' jury." *Ante,* at 182. But in the wake of this Court's decision in *Adams* v. *Texas,* 448 U. S. 38 (1980), this distinction is simply untenable.

### B

In *Adams,* this Court applied the principles of *Witherspoon* to the Texas death-penalty scheme. Under that scheme, if a defendant is convicted of a capital offense, a separate sentencing proceeding is held at which additional aggravating or mitigating evidence is admissible. The jury then must answer three questions based on evidence adduced during either phase of the trial:

> "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> "(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in reponse to the provocation, if any, by the deceased." Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon Supp. 1986).

See *Adams, supra,* at 40–41. If the jury finds beyond a reasonable doubt that the answer to each of these questions is "yes," the court must impose a death sentence; a single "no"

answer requires the court to impose a sentence of life imprisonment. With the role of the jury so defined, *Adams* held that Texas could not constitutionally exclude every prospective juror unable to state under oath that "the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact." Tex. Penal Code Ann. § 12.31(b) (1974); see *Adams, supra,* at 42. The "process" of answering the statutory questions, the Court observed, "is not an exact science, and the jurors under the Texas bifurcated procedure unavoidably exercise a range of judgment and discretion while remaining true to their instructions and their oaths." 448 U. S., at 46. Consequently, while Texas could constitutionally exclude jurors whose scruples against the death penalty left them unable "to answer the statutory questions without conscious distortion or bias," *ibid.*, it could not exclude those

> "[who] aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law." *Id.,* at 50.

The message of *Adams* is thus that even where the role of the jury at the penalty stage of a capital trial is limited to what is essentially a factfinding role, the right to an impartial jury established in *Witherspoon* bars the State from skewing the composition of its capital juries by excluding scrupled jurors who are nonetheless able to find those facts without distortion or bias. This proposition cannot be limited to the penalty stage of a capital trial, for the services that Adams'

jury was called upon to perform at his penalty stage "are nearly indistinguishable" from those required of juries at the culpability phase of capital trials. Gillers, Proving the Prejudice of Death-Qualified Juries after *Adams v. Texas*, 47 U. Pitt. L. Rev. 219, 247 (1985). Indeed, JUSTICE REHNQUIST noted in *Adams* that he could "see no plausible distinction between the role of the jury in the guilt/innocence phase of the trial and its role, as defined by the State of Texas, in the sentencing phase." 448 U. S., at 54 (dissenting). Contrary to the majority's suggestion, *ante* at 183, this point was at no time repudiated by the *Adams* Court. And the absence of a reply to JUSTICE REHNQUIST was not an oversight. At the penalty stage of his trial, Adams' jury may have been called upon to do something more than ascertain the existence *vel non* of specific historical facts. Yet the role assigned a jury at a trial's culpability phase is little different, for there the critical task of the jury will frequently be to determine not whether defendant actually inflicted the fatal wound, but rather whether his level of culpability at the time of the murder makes conviction on capital murder charges, as opposed to a lesser count, more appropriate. Representing the conscience of the community, the jurors at both stages "unavoidably exercise a range of judgment and discretion while remaining true to their instructions and their oaths." 448 U. S., at 46.

*Adams* thus provides clear precedent for applying the analysis of *Witherspoon* to the guilt phase of a criminal trial. Indeed, respondent's case is even stronger than Witherspoon's. The Court in *Witherspoon* merely presumed that the exclusion of scrupled jurors would unacceptably increase the likelihood that the defendant would be condemned to death. Respondent here has gone much further and laid a solid empirical basis to support his claim that the juries produced by death qualification are substantially more likely to convict.

## IV

### A

One need not rely on the analysis and assumptions of *Adams* and *Witherspoon* to demonstrate that the exclusion of opponents of capital punishment capable of impartially determining culpability infringes a capital defendant's constitutional right to a fair and impartial jury. For the same conclusion is compelled by the analysis that in *Ballew* v. *Georgia*, 435 U. S. 223 (1978), led a majority of this Court[7] to hold that a criminal conviction rendered by a five-person jury violates the Sixth and Fourteenth Amendments.

Faced with an effort by Georgia to reduce the size of the jury in a criminal case beyond the six-member jury approved by this Court in *Williams* v. *Florida*, 399 U. S. 78 (1970), this Court articulated several facets of the inquiry whether the reduction impermissibly "inhibit[ed] the functioning of the jury as an institution to a significant degree." *Ballew*, *supra*, at 231. First, the Court noted that "recent empirical data" had suggested that a five-member jury was "less likely to foster effective group deliberation" and that such a decline in effectiveness would likely lead "to inaccurate factfinding and incorrect application of the common sense of the community to the facts." *Id.*, at 232. The Court advanced several explanations for this phenomenon:

> "As juries decrease in size . . . , they are less likely to have members who remember each of the important pieces of evidence or argument. Furthermore, the smaller the group, the less likely it is to overcome the biases of its members to obtain an accurate result. When individual and group decisionmaking were com-

---

[7] Although the opinion of JUSTICE BLACKMUN in *Ballew* was cosigned by only JUSTICE STEVENS, three other Justices specifically joined that opinion "insofar as it holds that the Sixth and Fourteenth Amendments require juries in criminal trials to contain more than five persons." 435 U. S., at 246 (opinion of BRENNAN, J., joined by Stewart and MARSHALL, JJ.).

pared, it was seen that groups performed better because prejudices of individuals were frequently counterbalanced, and objectivity resulted." *Id.*, at 233 (footnotes omitted).

The Court also cited empirical evidence suggesting "that the verdicts of jury deliberation in criminal cases will vary as juries become smaller, and that the variance amounts to an imbalance to the detriment of one side, the defense." *Id.*, at 236. Lastly, the Court observed that further reductions in jury size would also foretell problems "for the representation of minority groups in the community." *Ibid.*

B

Each of the concerns that led this Court in *Ballew* to find that a misdemeanor defendant had been deprived of his constitutional right to a fair trial by jury is implicated by the process of death qualification, which threatens a defendant's interests to an even greater extent in cases where the stakes are substantially higher. When compared to the juries that sit in all other criminal trials, the death-qualified juries of capital cases are likely to be deficient in the quality of their deliberations, the accuracy of their results, the degree to which they are prone to favor the prosecution, and the extent to which they adequately represent minority groups in the community.

The data considered here, as well as plain common sense, leave little doubt that death qualification upsets the "counterbalancing of various biases" among jurors that *Ballew* identified as being so critical to the effective functioning of juries. *Id.*, at 234. The evidence demonstrates that "a person's attitude toward capital punishment is an important indicator of a whole cluster of attitudes about crime control and due process." Fitzgerald & Ellsworth, Due Process vs. Crime Control: Death Qualification and Jury Attitudes, 8 Law & Hum. Behav. 31, 46 (1984). Members of the excluded group have been shown to be significantly more concerned with the con-

stitutional rights of criminal defendants and more likely to doubt the strength of the prosecution's case. No doubt because diversity promotes controversy, which in turn leads to a closer scrutiny of the evidence, one study found that "the members of mixed juries [composed of *Witherspoon*-excludables as well as death-qualified jurors] remember the evidence better than the members of death-qualified juries." Cowan, Thompson, & Ellsworth, 8 Law & Hum. Behav., at 76. This study found that not only is the recall of evidence by a death-qualified jury likely to be below the standard of ordinary juries, but its testing of that evidence will be less rigorous. *Id.*, at 75. It thus appears that in the most serious criminal cases—those in which the State has expressed an intention to seek the death penalty—the ability of the jury to find historical truth may well be impaired.

The role of a jury in criminal cases, however, is not limited to the determination of historical facts. The task of ascertaining the level of a defendant's culpability requires a jury to decide not only whether the accused committed the acts alleged in the indictment, but also the extent to which he is morally blameworthy. Thus, especially in capital cases, where a defendant invariably will be charged with lesser included offenses having factual predicates similar to those of the capital murder charges, see *Beck* v. *Alabama* 447 U. S. 625 (1980), it may be difficult to classify a particular verdict as "accurate" or "inaccurate." However, the *Ballew* Court went beyond a concern for simple historical accuracy and questioned any jury procedure that systematically operated to the "detriment of . . . the defense." 435 U. S., at 236.

With even more clarity than the data considered in *Ballew*, the studies adduced by respondent show a broad pattern of "biased decisionmaking," *Ballew, supra*, at 239. It is not merely that the jurors who survive death qualification are more likely to accept the word of the prosecution and be satisfied with a lower standard of proof than those who are excluded. The death-qualified jurors are actually more likely

to convict than their peers. Whether the verdict against a particular capital defendant will actually be different depends on the strength of the evidence against him, the likelihood that, absent death qualification, one or more *Witherspoon*-excludables would have sat on his jury, and a host of other factors. See Gillers, 47 U. Pitt. L. Rev., at 232–238. However, *Ballew* points to the importance of considering the effects of a particular jury procedure over a range of cases, and not focusing on the fairness of any single trial. Because it takes only one juror unwilling to find that the prosecution has met its burden for a trial to end in either a mistrial or a compromise verdict, "it can be confidently asserted that, over time, some persons accused of capital crimes will be convicted of offenses—and to a higher degree—who would not be so convicted" had all persons able to assess their guilt impartially been permitted to sit on their juries. *Hovey* v. *Superior Court,* 28 Cal. 3d 1, 25, n. 57, 616 P. 2d 1301, 1314, n. 57 (1980).

Death qualification also implicates the *Ballew* Court's concern for adequate representation of minority groups. Because opposition to capital punishment is significantly more prevalent among blacks than among whites, the evidence suggests that death qualification will disproportionately affect the representation of blacks on capital juries. Though perhaps this effect may not be sufficient to constitute a violation of the Sixth Amendment's fair-cross-section principle, see *Duren* v. *Missouri,* 439 U. S. 357, 363–364 (1979), it is similar in magnitude to the reduction in minority representation that the *Ballew* Court found to be of "constitutional significance" to a defendant's right to a fair jury trial, 435 U. S., at 239. See White, Death-Qualified Juries: The "Prosecution Proneness" Argument Reexamined, 41 U. Pitt. L. Rev. 353, 387–389 (1980).

The principle of "impartiality" invoked in *Witherspoon* is thus not the only basis for assessing whether the exclusion of jurors unwilling to consider the death penalty but able impar-

tially to determine guilt infringes a capital defendant's constitutional interest in a fair trial. By identifying the critical concerns that are subsumed in that interest, the *Ballew* Court pointed to an alternative approach to the issue, drawing on the very sort of empirical data that respondent has presented here. And viewed in light of the concerns articulated in *Ballew*, the evidence is sufficient to establish that death qualification constitutes a substantial threat to a defendant's Sixth and Fourteenth Amendment right to a fair jury trial—a threat constitutionally acceptable only if justified by a sufficient state interest.

## C

Respondent's challenge to the impartiality of death-qualified juries focuses upon the imbalance created when jurors particularly likely to look askance at the prosecution's case are systematically excluded from panels. He therefore appears to limit his constitutional claim to only those cases in which jurors have actually been struck for cause because of their opposition to the death penalty. Tr. of Oral Arg. 26. However, this limitation should not blind the Court to prejudice that occurs even in cases in which no juror has in fact been excluded for refusing to consider the death penalty.

There is considerable evidence that the very process of determining whether any potential jurors are excludable for cause under *Witherspoon* predisposes jurors to convict. One study found that exposure to the *voir dire* needed for death qualification "increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted." Haney, On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process, 8 Law & Hum. Behav. 121, 128 (1984). See *Hovey, supra*, at 73, 616 P. 2d, at 1349. Even if this prejudice to the accused does not constitute an independent due process violation, it surely should be taken into account in any inquiry into the effects of death qualification. "[T]he process effect may function additively

to worsen the perspective of an already conviction-prone jury whose composition has been distorted by the outcome of this selection process . . . ." Haney, Examining Death Qualification: Further Analysis of the Process Effect, 8 Law & Hum. Behav. 133, 151 (1984).

The majority contends that any prejudice attributed to the process of death-qualifying jurors is justified by the State's interest in identifying and excluding nullifiers before the guilt stage of trial. *Ante*, at 170, n. 7. It overlooks, however, the ease with which nullifiers could be identified before trial without any extended focus on how jurors would conduct themselves at a capital sentencing proceeding. Potential jurors could be asked, for example, "if there be any reason why any of them could not fairly and impartially try the issue of defendant's guilt in accordance with the evidence presented at the trial and the court's instructions as to the law." *Grigsby II*, 569 F. Supp., at 1310.[8] The prejudice attributable to the current pretrial focus on the death penalty should therefore be considered here and provides but another reason for concluding that death qualification infringes a capital defendant's "interest in a completely fair determination of guilt or innocence." *Witherspoon*, 391 U. S., at 520, n. 18.

## V

As the *Witherspoon* Court recognized, "the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment" may be accommodated without infringing a capital defendant's interest in a fair determination of his guilt if the State uses "one jury to decide guilt and another to

---

[8] Restriction of *voir dire* to this inquiry would limit the ability of the prosecution to use its peremptory challenges to strike those jurors who would have been excluded for cause under the current system of death qualification. And the power of this inquiry to root out *all* prejudices and biases, no matter how great a threat they pose to the fairness of a guilt determination, has only recently been established by this Court as a matter of law. See *Turner* v. *Murray*, *ante*, p. 28. But see *ante*, at 45 (MARSHALL, J., concurring in judgment in part and dissenting in part).

fix punishment." *Ibid.* Any exclusion of death-penalty op-
ponents, the Court reasoned, could await the penalty phase
of a trial. The question here is thus whether the State has
*other* interests that require the use of a single jury and de-
mand the subordination of a capital defendant's Sixth and
Fourteenth Amendment rights.

The only two reasons that the Court invokes to justify the
State's use of a single jury are efficient trial management and
concern that a defendant at his sentencing proceedings may
be able to profit from "residual doubts" troubling jurors who
have sat through the guilt phase of his trial. The first of
these purported justifications is merely unconvincing. The
second is offensive.

In *Ballew*, the Court found that the State's interest in sav-
ing "court time and . . . financial costs" was insufficient to
justify further reductions in jury size. 435 U. S., at
243–244. The same is true here. The additional costs that
would be imposed by a system of separate juries are not par-
ticularly high.

> "First, capital cases constitute a relatively small number
> of criminal trials. Moreover, the number of these cases
> in which a penalty determination will be necessary is
> even smaller. A penalty determination will occur only
> where a verdict on guilt has been returned that author-
> izes the possible imposition of capital punishment, and
> only where the prosecutor decides that a death sentence
> should be sought. Even in cases in which a penalty
> determination will occur, the impaneling of a new pen-
> alty jury may not always be necessary. In some cases,
> it may be possible to have alternate jurors replace any
> 'automatic life imprisonment' jurors who served at the
> guilt determination trial." Winick, 81 Mich. L. Rev.,
> at 57.

In a system using separate juries for guilt and penalty
phases, time and resources would be saved every time a capi-
tal case did not require a penalty phase. The *voir dire*

needed to identify nullifiers before the guilt phase is less extensive than the questioning that under the current scheme is conducted before *every* capital trial. The State could, of course, choose to empanel a death-qualified jury at the start of every trial, to be used only if a penalty stage is required. However, if it opted for the cheaper alternative of empaneling a death-qualified jury only in the event that a defendant were convicted of capital charges, the State frequently would be able to avoid retrying the entire guilt phase for the benefit of the penalty jury. Stipulated summaries of prior evidence might, for example, save considerable time. Thus, it cannot fairly be said that the costs of accommodating a defendant's constitutional rights under these circumstances are prohibitive, or even significant.

Even less convincing is the Court's concern that a defendant be able to appeal at sentencing to the "residual doubts" of the jurors who found him guilty. Any suggestion that the current system of death qualification "may be in the defendant's best interests, seems specious unless the state is willing to grant the defendant the option to waive this paternalistic protection in exchange for better odds against conviction." Finch & Ferraro, 65 Neb. L. Rev., at 69. Furthermore, this case will stand as one of the few times in which any legitimacy has been given to the power of a convicted capital defendant facing the possibility of a death sentence to argue as a mitigating factor the chance that he might be innocent. Where a defendant's sentence but not his conviction has been set aside on appeal, States have routinely empaneled juries whose only duty is to assess punishment, thereby depriving defendants of the chance to profit from the "residual doubts" that jurors who had already sat through a guilt phase might bring to the sentencing proceeding. In its statute authorizing resentencing without any reassessment of culpability, Arkansas has noted: "it is a waste of judicial resources to require the retrying of an error-free trial if the State wishes to seek to reimpose the death penalty." 1983 Ark. Gen. Act.

No. 546, §3, note following Ark. Rev. Stat. Ann. §41–1358 (Supp. 1985).

But most importantly, it ill-behooves the majority to allude to a defendant's power to appeal to "residual doubts" at his sentencing when this Court has consistently refused to grant certiorari in state cases holding that these doubts cannot properly be considered during capital sentencing proceedings. See *Burr* v. *Florida*, 474 U. S. 879 (1985) (MARSHALL, J., dissenting from denial of certiorari); *Heiney* v. *Florida*, 469 U. S. 920 (1984) (MARSHALL, J., dissenting from denial of certiorari); *Burford* v. *State*, 403 So. 2d 943 (Fla. 1981), cert. denied, 454 U. S. 1164 (1982). Any suggestion that capital defendants will benefit from a single jury thus is more than disingenuous. It is cruel.

## VI

On occasion, this Court has declared what I believe should be obvious—that when a State seeks to convict a defendant of the most serious and severely punished offenses in its criminal code, any procedure that "diminish[es] the reliability of the guilt determination" must be struck down. *Beck* v. *Alabama*, 447 U. S., at 638. But in spite of such declarations, I cannot help thinking that respondent here would have stood a far better chance of prevailing on his constitutional claims had he not been challenging a procedure peculiar to the administration of the death penalty. For in no other context would a majority of this Court refuse to find any constitutional violation in a state practice that systematically operates to render juries more likely to convict, and to convict on the more serious charges. I dissent.